IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA :
           :
    v.      :  CRIMINAL ACTION NO.
           :  1:09-CR-475-WSD-CCH-5
JUAN REYNALDO CORDOVA :
           :

## REPORT AND RECOMMENDATION

Defendant Juan Reynaldo Cordova ("Defendant") is charged in the indictment with one count of aiding and abetting the commission of a robbery of a business in interstate commerce through the threat or use of violence on or about March 17, 2009, and one count of aiding and abetting the use of a firearm during and in relation to a crime of violence on or about March 17, 2009.  This action is before the Court on Defendant's Motion to Suppress Statements [40], Motion to Suppress Evidence [41], and Motion To Dismiss Indictment for Violation of the Double Jeopardy Clause of the 5th Amendment to the United States Constitution [43] ("Motion to Dismiss").

The Court held an evidentiary hearing on Defendant Cordova's Motion to Suppress Statements, Motion to Suppress Evidence, Motion to Dismiss and other pending motions on February 3, 2010, and a transcript of that hearing [81] was filed on February 17, 2010.  Thereafter, Defendant filed a post-hearing brief in support of

his Motion to Suppress Evidence and Motion to Dismiss [86] on March 31, 2010, the Government filed a response brief [91] to the Motion to Suppress Evidence and Motion to Dismiss on May 1, 2010, and Defendant filed a reply brief [94] to the Government's response on May 7, 2010, at which time the Motion to Suppress Evidence and Motion to Dismiss became ripe for resolution by the Court.

In his post-hearing brief in support of his Motion to Suppress Evidence and Motion to Dismiss [86] filed on March 31, 2010, Defendant Cordova states that, in light of the evidence presented at the evidentiary hearing held on February 3, 2010, he has **WITHDRAWN** his Motion to Suppress Statements [40].   Accordingly, Defendant Cordova's Motion to Suppress Statements [40] is **WITHDRAWN**.

Defendant Cordova has also filed a Motion to Suppress Evidence [41] in which he seeks to suppress items seized during searches on three separate dates:  March 21, 2009 [41-1], March 26, 2009 [41-2], and October 28-29, 2009 [41-3].  In his post-hearing brief, he states that he has withdrawn that portion of the motion that relates to the search on March 21, 2009 [41-1]. Def. Br. [86] at n.9.  Thus, that portion of the Motion to Suppress Evidence [41-1] is **WITHDRAWN**.  Furthermore, counsel for the Government has stated on the record that it will not seek to admit into evidence the items obtained during the search on October 28-29, 2009 [41-3].  T. at 86-88, 133-34;

2

Gov. Br. [91] at n.3.  That portion of the Motion to Suppress Evidence [41-3] is therefore **DENIED AS MOOT**.

Accordingly, the only evidence at issue remaining in the Defendant's Motion to Suppress Evidence is the evidence seized during the search of Defendant Cordova's residence that occurred on or about March 26, 2009 [41-2].  Having heard the evidence and having reviewed the transcript of the evidentiary hearings and the briefs of the parties, the undersigned **RECOMMENDS** that Defendant Cordova's Motion to Suppress Evidence [41-2] and Motion To Dismiss [43] be **DENIED**.

## **FINDINGS OF FACT**

1.   Special Agent Jason Tyler of the U.S. Immigration and Customs Enforcement ("ICE") works with the ICE Atlanta Gang Unit investigating federal crimes involving gang members. Transcript of February 3, 2010 Hearing ("T.") [81] at 51.

2.   Agent Tyler works with state and local law enforcement agencies to investigate crimes that involve gang members of a transnational origin.  T. at 52.

3.      Agent Tyler has investigated the activities of approximately 20 to 25 different gangs and is familiar with MS 13, a transnational street gang that is comprised of people from Central America and Mexico.  T. at 50, 52.

4.      In or around March of 2009, Agent Tyler received an e-mail that was a mass e-mail sent by the Gwinnett County Police Department to other law enforcement officers and agencies regarding a string of armed robberies in Gwinnett County asking for any information or assistance regarding the armed robberies.  T. at 53.

5.      In response to the e-mail, Agent Tyler contacted Detective McCullough of the Gwinnett County Police Department, and informed Det. McCullough that he recognized two of the suspects in the surveillance photos that were sent with the mass e-mail.  T. at 54.

6.      Agent Tyler believed that two of the suspects in the surveillance photos were members of the MS 13 gang.  T. at 54.

7.      Before responding to the e-mail, Agent Tyler had never previously spoken with Det. McCullough.  T. at 89-90.

4

8.     According to Agent Tyler, he provided a "support role" for the Gwinnett County Police Department's investigation of the armed robberies, which was headed by Det. McCullough.  T. at 54-55.

9.     In providing support to the Gwinnett County Police Department, Agent Tyler shared information he had on MS 13 gang members that were suspected to be involved in the armed robberies, including photographs, names, addresses, dates of birth, and known associations.  T. at 57.

10.     Agent Tyler had no control over the investigation into the armed robberies, and did not decide who would be arrested or what charges would be brought against anyone.  T. at 55.

11.     Agent Tyler had no involvement with the Gwinnett County District Attorney's office during their prosecution of anyone for the armed robberies, including Cordova, nor did Agent Tyler have any involvement in Cordova's plea in the Gwinnett County Superior Court in March of 2009.  T. at 55.

12.     Agent Tyler did not appear before the grand jury in Gwinnett County Superior Court, nor was Agent Tyler present at any of the court hearings involved in the case against Defendant Cordova in Gwinnett County Superior Court.  T. at 90.

5

13.   On or about March 26, 2009, Agent Tyler assisted Det. McCullough in executing arrest warrants for Espana and Landaverde (co-defendants in this action) in connection with Gwinnett County Police Department's investigation of the series of armed robberies.  T. at 66.

14.   Based on the information provided by Det. McCullough to Agent Tyler, there were at least four individuals who had been involved with the armed robberies, but only two people had been arrested.  T. at 68.

15.   Agent Tyler was aware that both Espana and Landaverde had been in the company of Defendant Cordova only five days earlier.  T. at 68.

16.   Because of Cordova's association with Espana and Landaverde only five days previously, Agent Tyler, along with Officer Jason Summers and another Gwinnett County officer, decided to talk to Cordova to find out if he had any information about the armed robberies.  T. at 68.

17.   Agent Tyler had the address that Cordova had provided to him on March 21, 2009, and it was Agent Tyler's idea to attempt to question him at that address. T. at 68, 99.

18.    Agent Tyler was accompanied by ICE Agent Steven Ledgerwood, ICE Agent Whitmore, Officer Jason Summers, and one other Gwinnett County police officer when he went to Cordova's address on or about March 26, 2009.  T. at 18, 30, 68-69.

19.    After the agents talked to two women who opened the door, the agents and officers determined that Cordova was not present in the house, and decided to leave.  T. at 19, 69.

20.    After the agents and officers walked down the driveway to the sidewalk, Defendant Cordova came running down the driveway from the house and said, "are you guys looking for me?"  T. at 19-20, 69.

21.    The agents then asked Cordova if they could talk to him inside the house; Cordova responded, "sure, no problem," and they walked back up the driveway to go into the house.  T. at 20, 70.

22.    When the agents and officers were walking back toward the house, Agent Tyler noticed a woman standing in the doorway whom he recognized as "Marisol" from a previous investigation, and knew her to be associated with MS 13 and Cordova.  T. at 70-71.

23.   Agent Tyler noticed that Marisol appeared to be visibly pregnant.  T. at 112.

24.   Cordova then walked toward the house and said to Marisol in Spanish, "sacar la mochila, sacar la mochila," which both Agent Tyler and Agent Ledgerwood heard and understood to mean "take out the bag or backpack."  T. at 21, 48-49, 71.

25.   After Cordova said that to Marisol, Agent Tyler saw her quickly turn and run in the front door of the residence.  T. at 71.

26.   Agent Tyler and Agent Ledgerwood had a very quick conversation of "did you hear that?" and "he said take out the bag," and they both ran to the front door. T. at 21, 71.

27.   Agent Ledgerwood entered the house first and Agent Tyler followed him into the house, but he could not see Marisol at that time.  T. at 21, 71.

28.   Agent Ledgerwood ran after the woman up the stairs because he was concerned that she intended to obtain a gun or other weapon.  T. at 23.

29.   Agent Tyler believed that when Cordova said "sacar la mochila" to Marisol that Cordova was referring to possible contraband, and Agent Tyler believed that

the "bag" likely contained evidence that Cordova wanted hidden or destroyed before the police entered the house, such as a weapon or illegal drugs.  T. at 72.

30.   The woman yelled upstairs to another man standing at the top of the stairs in Spanish, "take down the bag, get the bag," and she ran past the man and into a bedroom.  T. at 21, 49.

31.   Agent Ledgerwood followed the woman up the stairs and into the bedroom, and saw her go into a closet in the bedroom, grab a bag, and begin to open the bag. T. at 21-22.

32.   Agent Ledgerwood then pushed the woman away from the bag, threw the bag on the floor of the closet, and said, "what is going on?  Why are you running up here and grabbing the bag?"  T. at 22.

33.   Agent Ledgerwood then looked down into the open bag and saw the handle of a gun.  T. at 24.

34.   Agent Tyler followed Agent Ledgerwood up the stairs and down a hallway into a bedroom, and when Agent Tyler went into the bedroom, he saw Agent

Ledgerwood with Marisol and a pink backpack that had a Dora the Explorer emblem on the outside.  T. at 24, 73, 77.

35.     Officer Summers entered the bedroom after Agent Ledgerwood and Agent Tyler were already in the room; he saw Cordova's wife walking away from the open closet, and on the floor was a child's pink bookbag that was open in plain view and had a pistol inside of it.  T. at 125.

36.     Officer Summers took the gun out of the bookbag and discovered that it was loaded.  T. at 125.

37.     Cordova followed the agents into the bedroom, and Officer Summers then asked Cordova if he had any other weapons; Cordova responded that he did not. T. at 126.

38.     Officer Summers then asked Cordova if it would be all right if he took a look around the room and Cordova responded, "sure, go ahead."  T. at 25, 126.

39.     During a search of the bedroom, the officers discovered a case of beer of the brand (Modella) that had been reported stolen during some of the armed robberies, some cigarettes, and a black and white hooded sweatshirt that had a

distinctive design that Agent Tyler recognized from one of the photographs from the armed robbery surveillance videos.  T. at 26, 75, 126.

40.  Officer Summers asked Cordova if he could take those items discovered during the search – the pistol, beer, cigarettes, and sweatshirt – and Cordova said, "sure, go ahead."  T. at 126.

41.  Agent Tyler also discovered an Apple iphone, a red digital camera, and a second cell phone in the room, and in his report he indicated that Cordova gave consent to search the electronic media, although Agent Tyler does not specifically remember when he obtained consent from Cordova.  T. at 76.

42.  According to Agent Tyler, it is his normal practice to ask for consent to search electronic media separately from asking consent to search a room, because consent to search a room does not include consent to search the electronic media.  T. at 76.

43.  Agent Tyler did not obtain written consent from Cordova to search the electronic media.  T. at 114.

44.    Cordova was "very cooperative" during the search and assisted Agent Tyler in the search of the iphone and camera by attempting to find a cord so that Agent Tyler could make copies of photographs onto a flash drive.  T. at 27, 77, 129.

45.    None of the agents or officers threatened Cordova or made any promises to Cordova to gain his consent to a search of the bedroom, nor did the agents or officers physically intimidate Cordova, or attempt to physically detain him in any way.  T. at 78-79, 127-28.

46.    Cordova was not handcuffed or placed under arrest at any time before, during, or after the search of the bedroom.  T. at 79.

47.    Officer Summers contacted Det. McCullough about the items that were found at Cordova's residence and Det. McCullough asked him to ask Cordova if Cordova would come voluntarily to the police station for questioning; Officer Summers then asked Cordova if he would come in for questioning and Cordova agreed.  T. at 78, 127.

48.    Agent Tyler eventually went to the Gwinnett County Police Department where Cordova was being interviewed by Det. McCullough, but Agent Tyler was not part of the interview and had a "very limited" role.  T. at 80.

49.    Defendant Cordova was eventually arrested on the federal warrant issued in this

        action on October 28, 2009.  T. at 83.

50.    Counsel for the Government does not intend to introduce into evidence any

        statements made by Defendant Cordova on October 28 or 29, 2009.  T. at 86-

        88, 133-34.

## DISCUSSION

I.    Defendant Cordova's Motion to Suppress Statements

        Defendant initially filed a Motion to Suppress Statements [40] in which he

argued that any statements he made to law enforcement officers on March 26, 2009,

March 30, 2009, October 28, 2009, or October 29, 2009 should be suppressed from

introduction into evidence at trial.  In his post-hearing brief in support of his Motion

to Suppress Evidence and Motion to Dismiss [86] filed on March 31, 2010, Defendant

Cordova states that, in light of the evidence presented at the evidentiary hearing held

on February 3, 2010, he has **WITHDRAWN** his Motion to Suppress Statements [40].

See Def. Br. [86] at n.1, n.7.  Accordingly, Defendant Cordova's Motion to Suppress

Statements [40] is **WITHDRAWN**.

II.     Defendant Cordova's Motion to Suppress Evidence

Defendant Cordova has moved to suppress all evidence obtained from the search and seizure of his person at El Chaparral restaurant on March 21, 2009 [41-1], from the search and seizure of his person and his home on March 26, 2009 [41-2], and from the search and seizure of his home on October 28-29, 2009 [41-3]. Def. Motion to Suppress Evidence [41] at 1. In his post-hearing brief in support of his Motion to Suppress Evidence and Motion to Dismiss [86] filed on March 31, 2010, he states that he has withdrawn that portion of the Motion to Suppress Evidence that relates to the evidence obtained from the search and seizure of his person at El Chaparral restaurant on March 21, 2009. Def. Br. [86] at n.9. Thus, that portion of the Motion to Suppress Evidence [41-1] is **WITHDRAWN**.

Furthermore, counsel for the Government has stated on the record that it will not seek to admit into evidence the items obtained during the search of Defendant's residence at the time of his arrest on October 28 or 29, 2009. T. at 86-88, 133-34; Gov. Br. [91] at n.3. That portion of the Motion to Suppress Evidence [41-3] is therefore **DENIED AS MOOT**. Accordingly, the only evidence at issue remaining in the Defendant's Motion to Suppress Evidence is the evidence seized during the

search of Defendant Cordova's residence that occurred on or about March 26, 2009 [41-2].

Defendant Cordova argues that all the items seized from his home on or about March 26, 2009, must be suppressed from introduction into evidence because the officers conducted a warrantless search which was presumptively unreasonable and thus unlawful under the Fourth Amendment. He argues that none of the recognized exceptions to the warrant requirement applies to the search at issue in this case, and that any consent that Defendant gave to search the bedroom was involuntary and invalid because it was "mere acquiescence" to the agents' show of authority.

To prevail on a claim that evidence was seized in violation of his Fourth Amendment rights, a defendant first bears the burden of demonstrating his legitimate and reasonable expectation of privacy in the areas searched. United States v. Baron-Mantilla, 743 F.2d 868, 869 (11th Cir. 1984) (*citing* Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978)). The legitimacy of a defendant's privacy interest is determined by the totality of circumstances surrounding the defendant's relationship with the place or item searched. Baron-Mantilla, 743 F.2d at 870; see also Rakas, 439 U.S. at 152 ("The ultimate question . . . is whether one's claim to privacy from governmental intrusion is reasonable in light of all the surrounding circumstances."). In this case,

the Government does not challenge Defendant's argument that he had a legitimate expectation of privacy with respect to the bedroom that was searched on March 26, 2009.

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy.  U.S. Const. amend. IV; <u>Florida v. Jimeno</u>, 500 U.S. 248, 250 (1991); <u>United States v. Place</u>, 462 U.S. 696, 706-07 (1983).  Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location.  <u>Skinner v. Railway Labor Executives' Ass'n</u>, 489 U.S. 602, 619 (1989); <u>Mincey v. Arizona</u>, 437 U.S. 385, 390 (1978).

Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions.  <u>Payton v. New York</u>, 445 U.S. 573, 603 (1980);  <u>Katz v. United States</u>, 389 U.S. 347 (1967).  Because a warrantless search or seizure is presumptively invalid, the burden is ordinarily on the Government to establish by a preponderance of the evidence that a particular exception to the warrant requirement applies.  <u>Lego v. Twomey</u>, 404 U.S. 477, 92 S. Ct. 619 (1972); <u>Vale v. Louisiana</u>, 399 U.S. 30, 34 (1970).  Under the

doctrine commonly known as the exclusionary rule, evidence is inadmissible if it is obtained through a search and seizure that is conducted without a warrant and is not subject to one of the specific exceptions to the warrant requirement.  Mapp v. Ohio, 367 U.S. 643, 655 (1961).

In the instant action, the Government argues that two exceptions to the warrant requirement applied with respect to the search of Defendant Cordova's bedroom on March 26, 2009.  First, the Government argues that Defendant Cordova voluntarily gave his consent to a search of the bedroom.  According to the Government, when Defendant Cordova agreed to speak to the agents and agreed to allow them to enter the house, that consent to entry into the house also included his consent for them to go up the stairs and into the bedroom, at which time they obtained his consent to search the bedroom.  Second, the Government argues that, even if the agents did not have Cordova's consent to enter the bedroom before the agents entered the bedroom, the agents were conducting a lawful "protective sweep" of the residence when they followed the Defendant's girlfriend up the stairs and into the bedroom, based on a reasonable suspicion that the girlfriend was attempting to obtain a weapon or destroy evidence.

Although the Government argues that Cordova gave his consent to search the bedroom, the Court finds that the credible evidence in the record indicates that Cordova did not give any consent for the agents to enter the bedroom or to search the bedroom until after Agent Ledgerwood and Agent Tyler had already entered the bedroom and had found the gun in the pink backpack.[1]  According to the testimony of Agent Ledgerwood, after Cordova agreed to speak with them inside the house, the agents were walking back to the house and noticed a woman standing in the doorway of the house, at which time Agent Ledgerwood heard the man say to the woman "sacar la mochila" in a low voice, under his breath, which meant "take out the bag" in Spanish.  T. at 21, 48-49.  Agent Ledgerwood said to Agent Tyler, "did you hear that?" to which Agent Tyler responded, "yeah, I heard it."  T. at 21.  The woman then went quickly inside the house and up the stairs, and Agent Ledgerwood followed directly behind her.  T. at 21.

Agent Ledgerwood testified that he ran after the woman up the stairs because he was concerned that she intended to obtain a gun or other weapon.  T. at 23.  Despite

---

[1]  Although Agent Ledgerwood and Agent Tyler testified only that they were invited into the house, Officer Summers recalled that Defendant Cordova invited the officers upstairs to his bedroom.  T. at 125, 143.  Given Officer Summers's confusion to the events, the Court does not credit his testimony that the officers were invited upstairs to Defendant's bedroom.  See T. at 142-43.

not having express consent to go up the stairs, Agent Ledgerwood followed the woman and saw her go into a closet in the bedroom, grab a bag, and begin to open the bag.  T. at 21-22.  Agent Ledgerwood testified that he pushed the woman away from the bag, threw the bag on the floor of the closet, and said, "what is going on?  Why are you running up here and grabbing the bag?"  T. at 22.  Agent Ledgerwood then looked down into the open bag and saw the handle of a gun.  T. at 24.  According to Agent Ledgerwood, he then said to Agent Tyler who had followed him into the bedroom, "we have a gun in here.  We need to get Summers up here."  T. at 24.

Agent Tyler also testified that he and Agent Ledgerwood went up the stairs and entered the bedroom without Cordova's express consent to do so.  According to Agent Tyler, after Cordova agreed to speak with the agents inside the house, the agents began walking back toward the house with Cordova and Agent Tyler noticed a woman standing in the doorway whom he recognized as "Marisol" from a previous investigation, and knew her to be associated with MS 13 and Cordova.  T. at 70-71.  Agent Tyler testified that Cordova walked toward the house and yelled to Marisol in Spanish, "sacar la mochila, sacar la mochila," which Agent Tyler knew meant "take out the bag or backpack."  T. at 71.  After Cordova said that to Marisol, Agent Tyler saw her quickly turn and run in the front door of the residence.  T. at 71.  Agent Tyler

19

recalls that he and Agent Ledgerwood had a very quick conversation of "did you hear that?" and "he said take out the bag," and they both ran to the front door.  T. at 71. Agent Ledgerwood entered the house first and Agent Tyler followed him into the house, but he could not see Marisol at that time.  T. at 71.

Like Agent Ledgerwood, Agent Tyler also believed that when Cordova said "sacar la mochila" to Marisol that Cordova was possibly referring to a weapon or other contraband, and Agent Tyler believed that the "bag" likely contained evidence that Cordova wanted hidden or destroyed before the police entered the house, such as a weapon or illegal drugs.  T. at 72.  Agent Tyler followed Agent Ledgerwood up the stairs and down a hallway into a bedroom, and when Agent Tyler went into the bedroom, he saw Agent Ledgerwood with Marisol and a pink backpack that had a Dora the Explorer emblem on the outside.   T. at 73, 77.   Thus, both Agent Ledgerwood and Agent Tyler testified that they went into the house, up the stairs and entered the bedroom without Cordova's express consent to do so, and that Cordova followed them into the bedroom after Agent Ledgerwood had already discovered the gun in the pink backpack.  When Cordova eventually followed the agents into the bedroom, Agent Tyler asked him about the firearm in the bag, asking him "what was all that about?" and "why did you do that?"  T. at 74.  It was only after the discovery

of the gun in the pink backpack that Officer Summers asked Cordova for permission to search the bedroom, and Cordova responded "sure, go ahead."  T. at 74-75, 126.

Thus, the testimony from Agent Ledgerwood, Agent Tyler, and Officer Summers is that Cordova did not give any consent to search the bedroom until after the agents had already entered the bedroom and Agent Ledgerwood had discovered the gun in the pink backpack.  The Government argues, however, that even if Agent Ledgerwood and Agent Tyler entered the bedroom without Cordova's express consent, and discovered the gun in the pink backpack before Cordova had given his consent to search the bedroom, the agents' entry into the bedroom was lawful as a "protective sweep" of the house.  The Supreme Court has held that one exception to the warrant requirement allows police officers to conduct a protective sweep "to ensure their own safety."  Maryland v. Buie, 494 U.S. 325, 334 (1990).  Specifically, the Supreme Court set forth two standards to determine whether police officers were allowed to search the home of an individual being arrested.  Under the first standard, "as a precautionary matter and without probable cause or reasonable suspicion," officers may, incident to the arrest, "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."

21

Id.  This has been characterized as a type-one Buie search.  See United States v. Sunkett, 95 F.Supp.2d 1367, 1368 (N.D. Ga. 2000).

Under the second standard, police officers must possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Buie, 494 U.S. at 334.  This has been characterized as a type-two Buie search.  See Sunkett, 95 F.Supp.2d at 1368.  As a further cautionary measure, the Supreme Court stated that the protective sweep "may extend only to a cursory inspection of those spaces where a person may be found."  Buie, 494 U.S. at 335.

In the instant action, it is undisputed that Defendant Cordova was not under arrest at the time the officers went into his bedroom and searched the bedroom, nor was he placed under arrest even after the bedroom was searched.  The Buie "protective sweep" exception was originally applied only in cases in which the suspect was being arrested pursuant to a valid arrest warrant.  Although it appears that neither the Supreme Court nor the Eleventh Circuit has yet held in a published opinion that the Buie "protective sweep" exception may be expanded beyond situations involving the execution of a lawful arrest warrant, the Eleventh Circuit has noted in an

unpublished opinion that "most courts reviewing this issue have expanded *Buie* beyond in-home arrests pursuant to a warrant to all situations wherein officers are lawfully present in a home."  United States v. Leggette, 260 Fed. Appx. 247, 248-49 (11th Cir. 2008) (unpublished) (*citing* United States v. Miller, 430 F.3d 93, 99 (2d Cir. 2005) (agreeing with the First, Seventh, Fifth, Sixth, one panel of the Ninth, and the D.C. circuits that protective searches may be undertaken even without an arrest warrant)).  But see U.S. v. Torres-Castro, 470 F.3d 992, 997 (10th Cir. 2006) (noting that itself, the Eighth circuit, and one panel of the Ninth circuit were the only circuits to limit *Buie* to situations in which an arrest warrant is being executed).

Even in the absence of the unpublished Leggette decision, the undersigned finds persuasive the decisions by other courts holding that the Buie protective sweep exception may apply in situations when the officers are lawfully present in the suspect's home, even if the officers are not present in the home pursuant to a valid arrest warrant or are otherwise in the process of arresting the suspect.  As the Second Circuit explained, the reasons underlying the justification for the Buie protective sweep exception may be equally present in situations in which the suspect is not under arrest, but when the officers believe that there is a reasonable inference of danger to their safety:

23

We are, of course, keenly aware that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L.Ed.2d 752 (1972). We note, however, that *Buie's* progenitors, *Terry* and *Long*, did not concern searches stemming from arrests. *See Terry*, 392 U.S. at 24, 88 S. Ct. 1868; *Long*, 463 U.S. at 1049-50, 103 S. Ct. 3469. Moreover, *Buie* itself allowed for a protective sweep after an arrest had been completed. *See Buie*, 494 U.S. at 334-35, 110 S. Ct. 1093. These factors, along with *Buie's* grounding in the Fourth Amendment's reasonableness standard, convince us that the fact of an arrest or an attempted arrest (with or without an arrest warrant) is not a necessary precondition to a lawful protective sweep. The restriction of the protective sweep doctrine only to circumstances involving arrests would jeopardize the safety of officers in contravention of the pragmatic concept of reasonableness embodied in the Fourth Amendment. Although, an "arrest may be highly relevant" to the determination of whether officers possess reasonable suspicion of danger, *Gould*, 364 F.3d at 584, the effectuation of an arrest, regardless of whether pursuant to a warrant, is not the *sine qua non* of a permissible protective sweep. *See id.* Accordingly, we hold that specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant.

United States v. Miller, 430 F.3d 93, 99-100 (2d Cir. 2005) (*citing* Maryland v. Buie, 494 U.S. 325 (1990); Terry v. Ohio, 392 U.S. 1 (1968); Michigan v. Long, 463 U.S. 1032 (1983); United States v. Gould, 364 F.3d 578 (5th Cir. 2004) (*en banc*)).

The Second Circuit also noted in Miller that the majority of other courts that have addressed this issue have held that the protective sweep doctrine set forth in Buie is also applicable to other situations in which officers are lawfully in the suspect's

home, even when the officers are not present in the home for the purpose of executing an arrest warrant. Miller, 430 F.3d at 99; see United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005) ("police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry."); Leaf v. Shelnutt, 400 F.3d 1070, 1086-88 (7th Cir. 2005) ("[I]t was not necessary for the officers to have made an arrest in order for their search of the apartment to be justified; the only question is whether the search was objectively reasonable."); United States v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001) ("[T]he principle enunciated in *Buie* with regard to officers making an arrest–that the police may conduct a limited protective sweep to ensure the safety of those officers–applies with equal force to an officer left behind to secure the premises while a warrant to search those premises is obtained."); United States v. Garcia, 997 F.2d 1273, 1282 (9th Cir. 1993) (officers permitted to conduct protective sweep following consent entry); United States v. Patrick, 959 F.2d 991, 996-97 (D.C. Cir. 1992) ("Once the police were lawfully on the premises, they were authorized to conduct a protective sweep based on their reasonable belief that one of its inhabitants was trafficking in narcotics."). But see United States v. Davis, 290 F.3d 1239, 1242 n.4 (10th Cir. 2002) (reading *Buie* narrowly to apply only in the context of an arrest); United States v. Reid, 226 F.3d 1020, 1027 (9th Cir. 2000) (same).

The Fifth Circuit's decision in United States v. Gould, 364 F.3d 578 (5th Cir. 2004) (*en banc*) is instructive. In Gould, the officers went to the home of the suspect in order to question him, but they did not have a search warrant or an arrest warrant, nor did they intend to arrest him at the time. Gould, 364 F.3d at 580. The suspect in question was a convicted felon, and the officers had received a tip that he was planning to kill two local judges. Id. When the officers arrived at the suspect's residence, they were allowed entry into the home by another resident who informed the officers that the suspect was asleep in his bedroom. Id. The officers entered the residence and walked down the hall towards the bedroom where they were told the suspect was sleeping, but did not see the suspect in the room. Id. The officers then went through the open door into the bedroom, looked under the bed and opened the door to the bedroom closets, where they discovered three rifles in plain view. Id. The officers later found the suspect hiding in the woods, obtained his consent to search the bedroom, and seized the rifles. Id.

Although the district court in Gould originally granted the defendant's motion to suppress the weapons seized because the original search of the bedroom was conducted without a warrant or the consent of the defendant, the Fifth Circuit, *en banc*, reversed that decision and held that the officers' search of the bedroom was

26

lawful as a "protective sweep" under Buie, even in the absence of any search warrant or arrest warrant.  "[W]e hold that arrest is not always, or *per se*, an indispensable element of an in-home protective sweep, and that although arrest may be highly relevant, particularly as tending to show the requisite potential of danger to the officers, that danger may also be established by other circumstances."  Id. at 584; see also United States v. Scroggins, 599 F.3d 433, 440 (5th Cir. 2010) ("When police enter a home based on consent or another lawful basis, and possess a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene, they may conduct a protective sweep of the premises." (internal quotes and citations omitted)).

The Fifth Circuit's recent decision in Scroggins is likewise instructive.  In Scroggins, federal law enforcement agents went to a residence for the purpose of arresting a woman.  Scroggins, 599 F.3d at 438.  Prior to going to the residence, the agents had received an anonymous tip that, along with the female suspect, a male would also be present in the house and that the male may have been involved in some murders.  Id.  When the agents arrived at the home, they found the woman on the porch and arrested her without incident.  Id.  When the agents asked the woman if anyone else was present in the home, she responded that her husband was present.  Id.

The woman then asked the agents if she could return to the house to change her clothing, and the agents told her that she could not enter the house without the agents accompanying her, at which time, according to the finding of the trial court, the woman implicitly gave her consent to the agents to allow them into her home.  Id.

When the agents went into the home with the woman, they encountered a man in the hallway; although the agents shouted for him to stop, the man fled into a bedroom and the agents heard a loud thump.  Id.  When the man emerged from the bedroom, the agents ordered him to the floor, handcuffed him, frisked him, and discovered a wallet and a semi-automatic pistol magazine in his pocket.  Id.  The agents asked the man where the weapon was that went with the magazine, and the man indicated the bedroom.  Id.  The agents then performed a "security sweep" of the bedroom and the rest of the house, and observed two guns in plain view in the bedroom.  Id.  The man was detained, and after the agents identified him by the driver's license they had previously seized from his wallet during the frisk, the agents eventually arrested the man for being a felon in possession.  Id.

The defendant in Scroggins moved to suppress all the evidence seized during the warrantless search of his person and his home, and the trial court denied the motion.  Id. at 439.  In affirming the decision of the trial court to deny the defendant's

motion to suppress the evidence, the Fifth Circuit held that the agents were lawfully

in the defendant's home as a result of the consent of the woman who had been arrested

(who was his fiancée), and the agents were justified in conducting a protective sweep

of the home, including handcuffing and frisking the defendant, on the basis of the

defendant's actions when the agents entered the home.  Id. at 443.

> Both *Terry* and the protective sweep doctrine of *Gould* depend on a
> reasonableness inquiry that evolves with new information. Reasonable
> suspicion inquiries allow officers to consider the "totality of the
> circumstances–the whole picture." *United States v. Sokolow*, 490 U.S.
> 1, 7-8, 109 S. Ct. 1581, 104 L.Ed.2d 1 (1989). If officers gain new
> information relevant to safety or criminal conduct, the scope of their
> permissible investigation may expand. . . .  As an initial matter, we have
> little difficulty concluding that the officers were justified in conducting
> a protective sweep upon entry. . . .  Immediately upon entering the house,
> officers observed Scroggins flee despite their commands. This escalated
> the situation and created new grounds for suspecting danger.

Id. at 441-43.

Pursuant to the rationale set forth by the Fifth Circuit in the Gould and

Scroggins cases, as well as the other cases cited above, the undersigned concludes that

the agents in the instant action also acted lawfully by entering the upstairs bedroom

and conducting a protective sweep before they had obtained express consent from

Cordova to search the bedroom.  As set forth above in the findings of fact, Agent

Ledgerwood, Agent Tyler, and Officer Summers all testified that Cordova agreed to speak to them inside his house, and that he gave the agents and officers permission to enter his home. Thus, the Court finds that the officers were lawfully inside the Defendant's home with his consent. The Court further finds that, based on Cordova's subsequent behavior in saying "sacar la mochila" to the woman, or "take out the bag," and her reaction to turn quickly to head up the stairs, yell "sacar la mochila" to another man at the top of the stairs, and run into an upstairs bedroom, the officers had a "reasonable, articulable suspicion" that the upstairs bedroom might contain a weapon, and that reasonable suspicion justified a brief protective sweep of the bedroom.

As the Fifth Circuit has explained, the purpose of the protective sweep is to ensure the safety of the officers, and the officers are limited in conducting the protective sweep to only a "cursory inspection" and not a full search of the premises:

> First, the police must have entered legally and for a legitimate law enforcement purpose. Second, the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene. Third, the protective sweep must be limited to a cursory inspection of only those spaces where a person may hide; it is not a full search of the premises. Finally, officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.

United States v. Mata, 517 F.3d 279, 286 (5th Cir. 2008) (*citing* Gould, 364 F.3d at 587; *quoted in* Scroggins, 599 F.3d at 444-45).

Based on the totality of the circumstances in this case, the Court finds that the agents complied with those requirements in conducting the protective sweep of the bedroom: after hearing Cordova say "sacar la mochila" to the woman and observing her turn quickly to go up the stairs, Agent Ledgerwood and Agent Tyler followed the woman upstairs and into the bedroom, Agent Ledgerwood took the backpack out of her hands, looked into the open backpack and discovered that it contained a gun. The testimony of the agents at the evidentiary hearing indicates that the discovery of the gun in the backpack ended the protective sweep, because the agents did not conduct any further search of the bedroom until after Cordova had given his consent to the search. After Agent Ledgerwood noticed the gun in the backpack and informed Agent Tyler of the gun, Officer Summers and Cordova also arrived in the bedroom; Officer Summers then asked Cordova for his consent to conduct a search of the bedroom, and Cordova gave his consent. Accordingly, the Court finds that the agents conducted a lawful protective sweep that led to the discovery of the gun in the pink backpack.

With respect to the items that were seized after the subsequent search of the bedroom, the Court finds that those items were seized pursuant to a lawful search that

31

was conducted with the consent of Defendant Cordova.  The Supreme Court has established that "[o]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citations omitted).  A search conducted pursuant to consent is not unreasonable so long as the consent is freely and voluntarily given.  Florida v. Royer, 460 U.S. 491 (1983); United States v. Tovar-Rico, 61 F.3d 1529 (11th Cir. 1995).  The Government bears the burden of proving that the consent was given freely and voluntarily.  Schnekloth, 412 U.S. at 248-49.  Consent may "not be coerced, by explicit or implicit means, by implied threat or covert force."  Id. at 228.  Whether a consent "was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  Id. at 227.

Among the relevant circumstances that may be considered are the defendant's youth, lack of education or low intelligence; the lack of any warnings regarding the accused's constitutional rights, and evidence of duress or coercion, such as deprivation of food or sleep and prolonged detention or questioning.  Id. at 226.  The Eleventh Circuit has also provided additional factors:

> The determination as to whether a suspect's consent is voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis. *Schneckloth v. Bustamonte*, 412 U.S. at 224-25, 93 S. Ct. at 2046. To assist the lower courts in making their determinations, this court has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. *United States v. Chemaly*, 741 F.2d at 1352 (quoting *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981) (footnotes omitted), *cert. denied*, 457 U.S. 1136, 102 S. Ct. 2965, 73 L.Ed.2d 1354 (1982)).

United States v. Blake, 888 F.2d 795, 798-99 (11th Cir. 1989).

In consideration of the Schneckloth factors, and the totality of the circumstances in this case, the undersigned finds that Defendant Cordova was fully capable of giving a free, voluntary, and informed consent to search and that he did so on or about March 26, 2009, when he gave his consent for a search of his bedroom. First, the evidence indicates that Defendant agreed to allow the officers into his home, and agreed to talk to them inside the home voluntarily. Furthermore, while Agent Ledgerwood and Agent Tyler both testified that they went up the stairs and into the bedroom without asking Defendant Cordova for permission to do so and before he expressly gave his

consent to search the bedroom, there is no evidence that Cordova ever attempted to stop them or asked them to leave.

In addition, there is no evidence that the Defendant was so young, uneducated, or suffering from such a low intelligence that he was unable to understand the implications of his granting consent to search.  There is also no evidence that Defendant was subjected to prolonged questioning, sleep or food deprivation, or any mental or physical discomfort or torture that would have forced him to give his consent under duress.  Instead, the evidence reflects that Defendant voluntarily gave his consent to a search of the bedroom when he was not handcuffed or subjected to any other physical restraints at the time he gave his consent to search.  Indeed, the testimony of the officers indicates that Defendant Cordova was extremely cooperative during the search and attempted to help them search the electronic media by looking for a USB cord so that they could copy photographs to a flash drive.

Defendant Cordova argues that his consent was not voluntary because, at the time he gave his consent to search, the agents had already exhibited a show of force and authority by going upstairs and into the bedroom without his permission and by forcefully taking the backpack away from his pregnant girlfriend.  Defendant thus argues that the hollow "consent" he gave was not truly voluntary.  The Supreme Court

has recognized that certain encounters with law enforcement are so inherently coercive that a suspect who appears to be expressing consent may be merely "acquiescing to a claim of lawful authority," such that his apparent consent can not be termed voluntary. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968); Fikes v. Alabama, 352 U.S. 191 (1957). The threshold for showing "inherent coercion" is extremely high, however, and courts have found effective voluntary consent in cases in which suspects were faced with a far more intimidating show of force than was present in this case. See, e.g., United States v. Hidalgo, 7 F.3d 1566 (11th Cir. 1993) (consent to search was voluntary although the defendant had just been arrested at gunpoint and had invoked his right to remain silent); United States v. Garcia, 890 F.2d 355 (11th Cir. 1989) (consent to search found voluntary after fourteen armed agents descended on suspect's house and, after being refused unlimited consent to search entire residence, threatened to return with a search warrant); United States v. Long, 866 F.2d 402 (11th Cir. 1989) (finding voluntary consent even after the police officers told homeowner that they would be back with a warrant and "dig the place up" if he refused permission to search).

    In contrast, the evidence in this case reflects that, before obtaining Defendant Cordova's consent to search his bedroom, the agents did not make any threats or

coercive statements, such as telling Defendant that he had no choice but to consent. The mere fact that the agents were law enforcement authorities and Defendant felt he had to respect authorities and let them do as they ask adds nothing to Defendant's argument; to adopt Defendant's argument would be to hold, effectively, that no encounter with an officer can ever be consensual, a premise the Court rejects. See, e.g., United States v. Guiterrez, 92 F.3d 468, 471 (7th Cir. 1996) ("The fact that an officer is armed does not vitiate consent.").

Considering the totality of the circumstances, the Court finds that Defendant Cordova's consent to search his residence was freely and voluntarily given and was given without undue force or coercion from the agents. Accordingly, the undersigned finds that the search was lawful and did not violate Defendant's Fourth Amendment rights, and the undersigned **RECOMMENDS** that Defendant Cordova's Motion to Suppress Evidence [41-2] be **DENIED**.

III.    Defendant Cordova's Motion to Dismiss

Defendant Cordova has also filed a Motion to Dismiss [43] in which he argues that the charges against him in the Indictment must be dismissed because the federal prosecution is barred by the double jeopardy clause of the Fifth Amendment.

36

According to Defendant, the Government is attempting to prosecute him for offenses for which he has already been prosecuted and sentenced in state court; he argues that this attempt to obtain multiple punishments for the same conduct violates the double jeopardy clause.  Although Defendant acknowledges that such dual prosecutions are considered lawful under the "dual sovereignty" doctrine, Defendant argues that dual sovereignty is a "flawed doctrine" and is "overdue for reconsideration by the modern Supreme Court."  Def. Br. [86] at 43.  The Court rejects Defendant's argument, and resists his request that this Court overrule decades of Supreme Court precedent to find that the Government has violated the double jeopardy clause by prosecuting Defendant for an offense for which he has also been prosecuted in state court.

The double jeopardy clause of the Fifth Amendment provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. The double jeopardy clause prohibits the imposition of multiple punishments for the same offense. Brown v. Ohio, 432 U.S. 161, 165 (1977); North Carolina v. Pearce, 395 U.S. 711, 717 (1969).  Successive prosecutions are only barred by the double jeopardy clause of the Fifth Amendment if the two offenses for which the defendant is prosecuted are the "same" for double jeopardy purposes. Heath v. Alabama, 474 U.S. 82, 87 (1985).  Under the "dual sovereignty" doctrine,

however, when a defendant commits one act that violates the laws of two separate sovereigns, the defendant has committed two distinct offenses for the purpose of the double jeopardy clause.  Id., 474 U.S. at 88 (*citing* United States v. Lanza, 260 U.S. 377, 382 (1922)).  When a defendant is prosecuted for the same offense by both a State and the federal government, the Supreme Court has uniformly held that the successive prosecutions do not violate the double jeopardy clause because the the States are separate sovereigns from the federal government and each State's power to prosecute is derived from its own "inherent sovereignty," not from the federal government.  Id. at 89 (*citing* United States v. Wheeler, 435 U.S. 313, 320 (1978)); see also Abbate v. United States, 359 U.S. 187, 193-194 (1959).

As the Supreme Court has explained, it would be both impractical and undesirable to prohibit the federal government from prosecuting an individual who has previously been prosecuted in a state court for the same offense:

> [I]f the States are free to prosecute criminal acts violating their laws, and the resultant state prosecutions bar federal prosecutions based on the same acts, federal law enforcement must necessarily be hindered. . . . But no one would suggest that, in order to maintain the effectiveness of federal law enforcement, it is desirable completely to displace state power to prosecute crimes based on acts which might also violate federal law. This would bring about a marked change in the distribution of powers to administer criminal justice, for the States under our federal system have the principal responsibility for defining and prosecuting

crimes. Thus, unless the federal authorities could somehow insure that there would be no state prosecutions for particular acts that also constitute federal offenses, the efficiency of federal law enforcement must suffer if the Double Jeopardy Clause prevents successive state and federal prosecutions. Needless to say, it would be highly impractical for the federal authorities to attempt to keep informed of all state prosecutions which might bear on federal offenses.

Abbate, 359 U.S. at 187 (internal citations omitted).

Although Defendant acknowledges that dual prosecutions by the State and federal government are considered lawful under the "dual sovereignty" doctrine, he argues that the scope of the dual sovereignty doctrine is limited when the prosecution by the State is a "sham prosecution" that is controlled by the federal government. In Bartkus v. Illinois, 359 U.S. 121 (1959), the Supreme Court affirmed the dual sovereignty doctrine and Justice Frankfurter, writing for the majority, concluded that, although federal officials acted in cooperation with state authorities in the Illinois prosecution, the record did not indicate that the state prosecution "was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal," nor did the record "sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." Bartkus, 359 U.S. at 123-24. From that language in Bartkus, some courts have

inferred a "sham prosecution" exception to the dual sovereignty doctrine.  United States v. Baptista-Rodriguez, 17 F.3d 1354, 1361 (11th Cir. 1994) (*citing* In re Kunstler, 914 F.2d 505, 517 (4th Cir. 1990); United States v. Bernhardt, 831 F.2d 181, 182 (9th Cir. 1987); United States v. Aboumoussallem, 726 F.2d 906, 910 (2d Cir. 1984); United States v. Liddy, 542 F.2d 76, 79 (D.C. Cir. 1976)).

The Eleventh Circuit, however, has not yet recognized any "sham prosecution" exception to the dual sovereignty doctrine.  See Baptista-Rodriguez, 914 F.2d at 1361 ("The Eleventh Circuit has not squarely confronted the validity of the sham prosecution exception. Twice before we declined to address the question because the defendants had not demonstrated sham prosecutions.  Once again, we need not decide whether the exception is valid, because even if it is, the appellants cannot prevail." (citations omitted)).  Defendant nevertheless argues that this Court should recognize that a "sham prosecution" is an exception to the dual sovereignty doctrine, and should find in this case that such a "sham prosecution" existed in the state court.  The Court declines to do so, and finds that, even if the Eleventh Circuit were to recognize a "sham prosecution" exception to the dual sovereignty doctrine, the evidence in the record does not support a finding that Defendant Cordova's prosecution by Gwinnett

County was a "sham prosecution" that was completely controlled by the federal law enforcement agents.

In order to demonstrate that a "sham prosecution" existed such that the dual sovereignty doctrine should be ignored, the defendant "must show that one sovereign was so dominated, controlled, or manipulated by the actions of the other that it did not act of its own volition." Baptista-Rodriguez, 914 F.2d at 1361 (*citing* United States v. Raymer, 941 F.2d 1031, 1037 (10th Cir. 1991); United States v. Liddy, 542 F.2d 76, 79 (D.C. Cir. 1976)).  It is not sufficient to establish merely that "federal officials acted in cooperation with state authorities, as is the conventional practice between the two sets of prosecutors throughout the country."  Bartkus, 359 U.S. at 123.

In the instant action, the record demonstrates that, although Agent Tyler and Agent Ledgerwood cooperated with members of the Gwinnett County Police Department in investigating the criminal activities of the alleged MS 13 gang members, and Agent Tyler in particular provided information that led to the arrest of Defendant Cordova, the evidence does not establish that Agent Tyler, Agent Ledgerwood, or any other federal agent was controlling or dominating the prosecution of Defendant Cordova by Gwinnett County.  According to Agent Tyler, he provided a "support role" for the Gwinnett County Police Department's investigation of the

41

armed robberies, which was headed by Det. McCullough. T. at 54-55. Agent Tyler shared information he had on MS 13 gang members that were suspected to be involved in the armed robberies, including photographs, names, addresses, dates of birth, and known associations. T. at 57. Agent Tyler testified that he had no control over the investigation into the armed robberies, and did not decide who would be arrested or what charges would be brought against anyone. T. at 55. Agent Tyler also had no involvement with the Gwinnett County District Attorney's office during their prosecution of anyone for the armed robberies, including Cordova, nor did Agent Tyler have any involvement in Cordova's plea in the Gwinnett County Superior Court in March of 2009. T. at 55. Agent Tyler did not appear before the grand jury in Gwinnett County Superior Court, nor was Agent Tyler present at any of the court hearings involved in the case against Defendant Cordova in Gwinnett County Superior Court. T. at 90.

In sum, the Court finds that, even if the Eleventh Circuit recognized a "sham prosecution" exception to the dual sovereignty doctrine, the evidence in the record does not support Defendant Cordova's argument that his prosecution by Gwinnett County was a "sham prosecution" that was controlled by federal agents. Instead, the record reflects that, although Agent Tyler participated in the investigation into the

42

armed robberies and provided information that led to the arrest of Defendant Cordova, the Gwinnett County Police Department controlled the investigation and the Gwinnett County District Attorney prosecuted Defendant Cordova on its own volition and authority.   Under the dual sovereignty doctrine, therefore, the prosecution of Defendant Cordova in the instant action does not violate the double jeopardy clause of the Fifth Amendment.   Accordingly, the undersigned **RECOMMENDS** that Defendant Cordova's Motion to Dismiss [43] be **DENIED**.

## RECOMMENDATION

For all the above reasons, the undersigned **RECOMMENDS** that Defendant Cordova's Motion to Suppress Evidence [41] and Motion To Dismiss [43] be **DENIED**.   Defendant Cordova's Motion to Suppress Statements [40] is **WITHDRAWN**.

IT IS SO RECOMMENDED this 23rd day of June, 2010.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE