IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA    :
    :
    v.    :    CRIMINAL ACTION NO.
    :    1:09-CR-475-WSD-CCH-5
JUAN REYNALDO CORDOVA    :    SUPERSEDING
    :

**<u>REPORT AND RECOMMENDATION</u>**

Defendant Juan Reynaldo Cordova ("Defendant") is charged in the superseding indictment with sixteen separate counts related to the armed robberies of seven gas stations in DeKalb County, Georgia, on the dates of March 15, 2009, March 17, 2009, March 19, 2009, March 21, 2009, and March 23, 2009. Defendant is charged with one count of conspiracy to engage in the robbery of a business engaged in interstate commerce, in violation of 18 U.S.C. § 1951; seven counts of robbing a business engaged in interstate commerce, in violation of 18 U.S.C. §§ 2 and 1951, and eight counts of using a firearm during a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c). The action is before the Court on Defendant's Supplemental Motion to Suppress Evidence [123] and Second Motion to Suppress Statements [132].

The Court held an evidentiary hearing on Defendant Cordova's Motions to Suppress on June 29, 2011, and a transcript of that hearing [169] was filed on July 20,

2011. Thereafter, Defendant filed a post-hearing brief in support of his Motions to Suppress [170] on August 5, 2011, the Government filed a response brief [171] to the Motions to Suppress on August 23, 2011, and Defendant filed a reply brief [172] to the Government's response on August 29, 2011, at which time the Motions to Suppress became ripe for resolution by the Court.

Having heard the evidence and having reviewed the transcript of the evidentiary hearings and the briefs of the parties, the undersigned **RECOMMENDS** that Defendant's Supplemental Motion to Suppress Evidence [123] and Second Motion to Suppress Statements [132] be **GRANTED**.

## **BACKGROUND FACTS**

Many of the relevant facts of this case are set out at length in the Report and Recommendation [99] of the undersigned dated June 23, 2010, and the Orders entered by Judge Duffey [110][119] on September 10, 2010 and December 17, 2010. Neither party has contested those facts and the undersigned hereby adopts the facts as set forth in the Report and Recommendation [99] and Orders [110][119].

In addition to those facts, the undersigned takes the following relevant facts from the evidentiary hearing that was held before the undersigned on February 3,

2

2010, on Defendant Cordova's previous Motion to Suppress Statements, Motion to Suppress Evidence, Motion to Dismiss and other motions.

In or around March of 2009, Detective Benny McCollough of the Gwinnett County Police Department was conducting an investigation involving a string of armed robberies in Gwinnett County and asked for information and assistance from other law enforcement agencies regarding the armed robberies. Transcript of February 3, 2010 Hearing ("T.") [81] at 53, 153-54. In the course of that investigation, law enforcement officers conducted a warrantless search of Defendant Cordova's residence on March 26, 2009, and discovered a gun, a case of Modella brand beer (which had been the brand of beer reported stolen in some of the armed robberies), some cigarettes, a black and white hooded sweatshirt, a camera, an iPhone, and another cell phone. T. at 26, 75-76, 125-6. According to Special Agent Jason Tyler of U.S. Immigration and Customs Enforcement ("ICE"), who had participated in the search, the sweatshirt had a distinctive design that he recognized from one of the photographs from the armed robbery surveillance videos. T. at 126.

After the evidence had been seized from Defendant Cordova's residence, Defendant Cordova was driven to the Gwinnett County Police Department by law enforcement officers in order to answer questions. T. at 127, 229-30. According to

Officer Jason Summers, he asked Defendant to come to the police station and Defendant "agreed" to come to the police station. T. at 127. Special Agent Tyler testified as follows about the decision to ask Defendant to come to the police station:

> It was my understanding that Officer Summers had contacted Detective McCollough and advised him of what we had found in Mr. Cordova's room, specifically the jacket, the cigarettes, the beer, and the gun. And after he contacted him, it was decided Gwinnett County, one of the two, Summers or Mr. McCollough, they were going to ask Mr. Cordova to come down to the police department to speak with Detective McCollough.

T. at 78.

At the evidentiary hearing before the undersigned on July 20, 2011, Defendant Cordova testified that, immediately after the search of his residence on March 26, 2009, Officer Summers told him that he was being taken to the police station for questioning. Transcript of July 20, 2011 Hearing ("T2.") [169] at 8. Defendant further testified that he was told that he was required to go to the police station by either Officer Summers or Officer Ledgerwood and was not given any choice about it. T2. at 18-19. According to Defendant, "[t]hey didn't threaten me but I didn't have any other option because they told me that I needed to go with them." T2. at 20.

Upon arrival at the Gwinnett County Police Department, Defendant Cordova was questioned by Detective McCollough, and a video recording was made of the interview. T. at 229-30; Gov. Ex. 1, 2. It is undisputed that Detective McCollough did not advise Defendant of his *Miranda* rights, including his right to remain silent, at that time. T. at 166-67; T.2 at 8-9. According to Detective McCollough, he did not advise Defendant of his *Miranda* rights at that time because he believed that Defendant was not under arrest and was not in custody. T. at 167. During the interview, Defendant made statements about he had come into possession of the gun that was found in his home, but he did not make any statement indicating that he was involved in the robberies that were being investigated. T. at 171-72, Gov. Ex. 2. After Detective McCollough completed the interview, Defendant was not arrested and he was allowed to return home. T. at 170-71.

Four days later, on March 30, 2009, Detective McCollough called Defendant and asked him to return to the police station for another interview. T. at 172, 177. According to Defendant's testimony, Detective McCollough called him and told him he "needed to go back to the police department." T2. at 24. Detective McCollough drove to Defendant's home and picked him up and they returned to the police station for the interview. T. at 172; T2. at 24. After approximately twenty minutes of

questioning, Detective McCollough told Defendant, "you have that gun at your house, you had the jacket and all of that beer, all of that Modella, ok, that right there, all right, it doesn't look good for you." Gov. Ex. 2. Detective McCollough then advised Defendant of his *Miranda* rights, including his right to remain silent. T. at 173; Gov. Ex. 2.

After further questioning for approximately twenty more minutes, Detective McCollough formally arrested Defendant and placed him in handcuffs. T. at 174-75; Gov. Ex. 2. While Detective McCollough was in the process of taking Defendant to the jail, Defendant told Detective McCollough that he had more he wanted to say, and then they went back to the interrogation room where Detective McCollough conducted another interview of Defendant. T. at 175-76.

The next day, March 31, 2009, Defendant contacted Detective McCollough through a third party who informed Detective McCollough that Defendant wanted to speak with him again. T. at 178-79. Detective McCollough went to the jail to meet with Defendant and then brought him back to police headquarters for more questioning. T. at 179, 234. At that time, Detective McCollough again advised Defendant of his *Miranda* rights before questioning him. T. at 179; Gov. Ex. 1. During that interview, Defendant again discussed how the seized items ended up in

his possession, and he also told Detective McCollough that Francisco Landaverde, Roberto Salazar, and Ronald Escobar were involved and pointed them out in the surveillance photographs. T. at 179-80.

## **DISCUSSION**

In the Motions to Suppress, Defendant Cordova argues that the Court must suppress all statements he made to law enforcement agents on March 26, 2009, March 30, 2009, and March 31, 2009.

## I.    **STATEMENTS ON MARCH 26, 2009 AND MARCH 30, 2009**

The Government has stated that it will not seek to introduce Defendant's statements made on March 26, 2009, and March 30, 2009. Gov. Br. [171] at 1. The Defendant's Motions to Suppress are thus unopposed with respect to the Defendant's statements made on March 26, 2009, and March 30, 2009. Because Defendant's Supplemental Motion to Suppress Evidence [123] seeks to suppress only portions of the statements made by Defendant on March 26 and March 30, 2009, the undersigned **RECOMMENDS** that Defendant's Supplemental Motion to Suppress Evidence [123] be **GRANTED**. The undersigned also **RECOMMENDS** that Defendant Cordova's

Motion to Suppress [132] be **GRANTED** with respect to the Defendant's statements made on March 26, 2009, and March 30, 2009.

## II.    STATEMENTS MADE ON MARCH 31, 2009

Defendant Cordova has also moved to suppress the statements he made to law enforcement officers on March 31, 2009, the day after he had been arrested. Defendant argues that the statements must be suppressed on several grounds. First, he argues that the statements must be suppressed because they were obtained as a direct result of the illegal seizure of evidence from Defendant's home and thus should be suppressed as "fruit of the poisonous tree." Second, he argues that the statements he made on March 31, 2009, must be suppressed because they were also tainted by his previous statements made on March 26, 2009, that were given without the benefit of *Miranda* warnings. Finally, he argues that the statements must be suppressed because they were not involuntary; he argues that the statements were coerced by the promises of immunity and threats of incarceration made by Detective McCollough.

**A.      Fruit of the Poisonous Tree**

Defendant Cordova first argues that his statements made to law enforcement officers on March 31, 2009 must be suppressed because the statements are "fruit of the poisonous tree" that were obtained directly as a result of the evidence that was illegally seized from his home on March 26, 2009.

In Judge Duffey's Order [119] dated December 17, 2010, he granted the Defendant's Motion to Suppress Evidence [41], holding that the evidence seized from Cordova's home on March 26, 2009 must be suppressed because the officers conducted a warrantless search in violation of the Defendant's Fourth Amendment rights:

> Under the facts present here, where law enforcement officials are in the driveway of a voluntarily cooperating individual twenty feet from the entrance of the house, Buie does not authorize them to rush inside the home and perform a protective search of that individual's upstairs bedroom, notwithstanding the individual's consent for them to enter the house to conduct an interview. The Court concludes, on the facts of this case, that the initial warrantless search of the bedroom was not authorized and the evidence discovered as a result of that search must be suppressed.

Order [119] at 22 (*citing Maryland v. Buie*, 494 U.S. 325 (1990)).

Judge Duffey further found that the initial unauthorized search of the Defendant's bedroom also tainted the later searches of Defendant's residence, notwithstanding the Defendant's consent to those searches:

> [E]valuating the events taken as a whole, this Court concludes that the initial unauthorized search of the bedroom tainted Cordova's later consent to the search of his bedroom and electrical devices, and that therefore those searches were not authorized under the Fourth Amendment. Moreover, for reasons identical to those just explained, the second–unauthorized–search of the bedroom, which discovered the electrical devices, further tainted Cordova's consent to search the electrical devices.

*Id.* at 27. As a result, Judge Duffey ordered the suppression of all the evidence obtained from the search of Defendant's residence on March 26, 2009, including a gun, a case of Modella beer (which was one of the brands that had been reported stolen during the robbers), cigarettes, a hooded sweatshirt with a distinctive design that Agent Tyler recognized from one of the armed robbery surveillance photographs, and information obtained from the search of an iphone, digital camera, and cell phone.

Defendant now argues that, based on Judge Duffey's holding that the warrantless search of his residence on March 26, 2009, was illegal, the Court must also suppress his statements made on March 31, 2009, because the statements were the "fruit" obtained from the "poisonous tree" of the illegal search. *See Wong Sun v.*

*United States*, 371 U.S. 471, 484-485 (1963) (describing "fruit of the poisonous tree" doctrine, which prohibits the introduction of derivative evidence, both tangible and testimonial, that is acquired as an indirect result of an unlawful search).

The Supreme Court has held that, whether evidence or testimony must be suppressed as "fruit of the poisonous tree" of an earlier constitutional violation depends on whether the subsequent evidence was obtained by an "exploitation of that illegality" or by other independent means:

> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, *Evidence of Guilt*, 221 (1959).

*Id.* at 487-88; *see also United States v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007).

In making the determination of whether evidence or a statement obtained after a prior violation of the suspect's constitutional rights was an "exploitation of that illegality," the Supreme Court has further explained that the question is highly

dependent upon the specific facts and circumstances, and no single fact is dispositive.

*Brown v. Illinois*, 422 U.S. 590, 603 (1975).

> The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Id.* at 603-04 (internal citations omitted); *see also Taylor v. Alabama*, 457 U.S. 687, 690 (1982) ("a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" (*quoting Brown,* 422 U.S. at 602 (*quoting Wong Sun*, 371 U.S. at 486))). The Eleventh Circuit has also held that the factors set forth in *Brown* are "non-exclusive" and that the court must consider the circumstances as a whole. *United States v. Lopez-Garcia*, 565 F.3d 1306, 1315 (11th Cir. 2009) (the temporal proximity of the seizure and consent, the presence of intervening circumstances, and the purpose and flagrancy of official misconduct are all "non-

exclusive factors" that may be considered by a court in determining whether a statement is the fruit of the poisonous tree of an earlier violation).

In addition to considering those "non-exclusive" factors, courts must apply a "common sense evaluation" of all the surrounding facts and circumstances in order to determine whether evidence is tainted as a "fruit" of previous unlawful conduct. *United States v. Kapperman*, 764 F.2d 786, 793 (11th Cir. 1985) ("[E]vidence that is not the "fruit" of prior unlawful police conduct need not be excluded. In determining whether there is a nexus between the evidence in question and the police conduct, our inquiry is essentially a common sense evaluation of the facts and circumstances of the particular case."); *see also United States v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007) ("we will not allow a factor-based analysis to obscure the underlying question, which 'generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response'" (*quoting United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982)).

Thus, the Court must make a "common sense evaluation" of the facts and circumstances of this particular case in order to determine whether Defendant's statements made on March 31, 2009 must be suppressed as the "fruit of the poisonous tree" of the illegal search of the Defendant's residence conducted on March 26, 2009.

In consideration of the totality of the circumstances of this case, the undersigned finds that a "common sense evaluation" supports a conclusion that the Defendant's statements on March 26, 2009, March 30, 2009, and March 31, 2009 were all "fruit of the poisonous tree" resulting from the evidence that was discovered during the illegal search of Defendant's residence on March 26, 2009.

The Court notes that Special Agent Tyler's testimony during the evidentiary hearing on February 3, 2010, indicates that the decision was made to bring Defendant into the police station for questioning on March 26, 2009, as a result of the discovery of the evidence in his home:

> It was my understanding that Officer Summers had contacted Detective McCollough and advised him of what we had found in Mr. Cordova's room, specifically the jacket, the cigarettes, the beer, and the gun. And after he contacted him, it was decided Gwinnett County, one of the two, Summers or Mr. McCollough, they were going to ask Mr. Cordova to come down to the police department to speak with Detective McCollough.

T. at 78.

Thus, that testimony, along with the testimony of the other law enforcement officers and Defendant, leads to the conclusion that it was the discovery of the gun, the sweatshirt, and the Modella beer that caused the agents to take Defendant in for

questioning on March 26, 2009. Regardless of whether the Defendant "agreed" to come to the police station voluntarily, as the officers testified, or whether the officers told the Defendant that he "needed" to go to the police station with them and did not give him any choice in the matter, the undersigned finds that the Defendant's statements made on March 26, 2009, were obtained through the "exploitation of the illegality" of the evidence that was discovered during the unlawful search of his home earlier that day.

Indeed, when asked about the statements that Defendant made on March 26, 2009, Detective McCollough testified: "He made statements about some items, beer, jacket, and the gun that was at his residence. He made statements as to where it all came from, how he had ended up being involved in it getting there." T. at 171. Without the discovery of the evidence obtained during the illegal search of the Defendant's residence, Detective McCollough would have had no reason to question the Defendant about those items and how they ended up in his residence. *See United States v. Davis*, 332 F.3d 1163 (9th Cir. 2003) ("[g]iven the direct causal link between the search and the statements and the absence of any applicable exception, we conclude that the district court should have suppressed Davis' statements as fruit of the poisonous tree" because "in the absence of the [unlawful] search, the police would

have known nothing about the shotgun and would thus have had no occasion to question Davis about its possession").

As discussed above, however, the statements made by Defendant on March 26, 2009, are not at issue because the Government states that it will not seek to introduce Defendant's statements made on either March 26, 2009, or March 30, 2009. Gov. Br. [171] at 1. The Government argues that the court must instead focus solely on the Defendant's statements made on March 31, 2009, which were made five days after the illegal search of his residence. The Government argues that a consideration of the *Brown* factors–the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, the purpose and flagrancy of the official misconduct–indicates that the Defendant's statements on March 31, 2009, were untainted by the illegality of the search.

While the *Brown* factors are relevant in making this determination, the Eleventh Circuit has held that they are "non-exclusive." *United States v. Lopez-Garcia*, 565 F.3d 1306, 1315 (11th Cir. 2009). Furthermore, the *Brown* case involved statements made by the defendant after an illegal arrest, not statements made after the police discovered evidence during an illegal search. *Brown v. Illinois*, 422 U.S. 590, 596-97 (1975). When the statements are instead made as a direct result of the "poisonous tree"

16

of an illegal search, the "more fine-tuned assessment" of the various factors set forth in *Brown* is generally not necessary. *See* 6 W. LaFave, *Search and Seizure* § 11.4(c), at 307 (4th ed. 2004).

> In the typical case in which the defendant was present when incriminating evidence was found in an illegal search or in which the defendant was confronted by the police with incriminating evidence they had illegally seized, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates. This is because "the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak."

*Id.* at 305-06 (*quoting* Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Cal. L. Rev. 579, 607 (1968)) (footnotes omitted)).

In this case, the officers conducted the illegal search of Defendant's residence on March 26, 2009, and upon the discovery of the gun, beer, and sweatshirt, immediately took him to the police station on that day for questioning. It is undisputed that Defendant received no *Miranda* warnings at that time, and that he was not advised of his *Miranda* rights until four days later, on March 30, 2009, the day that he was formally arrested. The Government argues that the statements made by the Defendant on March 31, 2009, the day after his arrest, cannot be considered an "exploitation of that illegality" because the statements were made five days after the illegal search, the

17

Defendant had been advised of his *Miranda* rights before making the statements, the Defendant *requested* the meeting with Detective McCollough on that day (through a third party), and there is no evidence that the officers conducted the search of Defendant's residence with any ulterior motive of coercing Defendant to make statements to law enforcement. While that rigid focus on the *Brown* factors solely as they apply to the statements made on March 31, 2009, appears to support the Government's argument, it ignores the statements that had already been made by Defendant on March 26, 2009, immediately after the illegal search. At that point, the Defendant knew that the "cat was out of the bag" regarding the gun, the beer, and the sweatshirt being discovered in his home, and the interview covered his attempt to explain how those items were in his possession.

Not only did Defendant know that "the cat was out of the bag" when he made the statements on March 30, 2009, but Detective McCollough exploited his knowledge of the illegally seized evidence to attack Defendant's statement. It is undisputed that Detective McCollough outlined the illegally seized evidence in such a way Defendant had little choice but to admit his role and offer to cooperate. On March 30, 2009, Detective McCollough told Defendant "you have that gun at your house, you had the jacket and all of that beer, all of that Modella, ok, that right there, all right, it doesn't

look good for you." Gov. Ex. 2. Only after convincingly using the illegally seized evidence to lead Defendant, and this Court, to the common sense understanding that he could not effectively deny guilt did the detective, finally, give Defendant his *Miranda* warnings.

In sum, the undersigned finds that, although the Defendant was advised of his *Miranda* rights prior to making the statements on March 31, 2009, that does not automatically free his statements from being "fruit of the poisonous tree" of the illegal search of his home that was conducted on March 26, 2009. *See* 6 Lafave, § 11.4(c) at 307 ("it is crystal clear that giving the defendant the *Miranda* warnings will not break the causal chain between an illegal search and a subsequent confession"). In addition, the fact that the statements made on March 31, 2009, occurred five days after the illegal search also does not break the causal chain in this case because the statements were made after the Defendant had already made previous statements on March 26 and March 30. The undersigned finds that all three of the statements were the "fruit of the poisonous tree" of the illegal search of the Defendant's home; once the "cat was out of the bag," the Defendant knew that the gun, beer, and sweatshirt had been found in his home and that discovery motivated him to discuss his possession of those items with Detective McCollough. *See United States v. Davis*, 332 F.3d 1163 (9th Cir. 2003)

("[g]iven the direct causal link between the search and the statements and the absence of any applicable exception, we conclude that the district court should have suppressed Davis' statements as fruit of the poisonous tree").

The Government argues, however, that this case should be controlled by application of the three *Brown* factors and a First Circuit case applying them to find that statements made after the illegal seizure of evidence were not fruit of the poisonous tree. *See United States v. Stark*, 499 F.3d 72, 75-55 (1st Cir. 2007). The *Stark* case, however, fails to distinguish between an illegal arrest and the illegal seizure of evidence. *Brown*, and most of the other cases relied upon by *Stark*, involved statements following illegal arrests.[1] Indeed, the Government points out in its brief that the cases cited by Defendant involved the suppression of statements that were deemed the fruit of an illegal arrest, not an illegal search. Gov. Br. at 6. Yet the Government commits the same offense by also citing primarily to cases involving

---

[1] *See Stark*, 499 F.3d at 76-77, collecting cases. In addition to statements following illegal arrests, the *Stark* court also cites to cases that did not suppress post-*Miranda* statements even if they repeated statements that had been made without *Miranda* warnings. Those cases are inapt. The Supreme Court has recognized that "unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth." *Dickerson v. United States*, 530 U.S. 428, 441 (2000); *see also Taylor v. Alabama*, 457 U.S. 687, 690 (1982) ("'[t]he exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth'" (*quoting Brown*, 422 U.S. at 601)).

20

statements made after an illegal arrest and not an illegal search. *See* Gov. Br. at 6-7 (citing *Taylor v. Alabama*, 457 U.S. 687 (1982) (although confession given after *Miranda* warnings was "voluntary" under Fifth Amendment, it must be suppressed under Fourth Amendment as "fruit of the poisonous tree" because it was made after an illegal arrest); *United States v. Lopez-Garcia*, 565 F.3d 1306 (11th Cir. 2009) (rejecting defendant's argument that arrest was illegal, and holding that statement following arrest would have been admissible even if arrest had been illegal); *United States v. Chanthasouxat*, 342 F.3d 1271 (11th Cir. 2003) (defendant's consent to search and other statements deemed inadmissible as fruit of an illegal traffic stop)).

There is a fundamental difference, however, between an illegal arrest and an illegal search and seizure of evidence. An arrest is not evidence of a crime; illegally seized evidence of a crime, on the other hand, can be (and in this case, was) used to convince a defendant that the government can convict him without a statement and to lead to a common-sense belief that confessing and cooperating are the only option. Were this Court to hold otherwise it would be left with the anomalous result that evidence obtained during an illegal search would be suppressed but then the existence and discovery of the evidence would be introduced by the statements of the Defendant obtained only as a result of the illegal search and seizure.

For these reasons, the undersigned finds that the Defendant's statements made on March 31, 2009 were "fruit of the poisonous tree" of the illegal search of his residence on March 26, 2009. Accordingly, the undersigned **RECOMMENDS** that Defendant Cordova's Motion to Suppress [132] be **GRANTED** with respect to the Defendant's statements made on March 31, 2009.

### B.    Effect of Previous Statements

Defendant next argues that the statements he made on March 31, 2009, must be suppressed because they were also tainted by his previous statements made on March 26, 2009, and March 30, 2009, that were given without the benefit of *Miranda* warnings. Although the undersigned is recommending herein that the Defendant's March 31 statements be suppressed on the ground that they were "fruit of the poisonous tree" of the illegal search, the undersigned will nevertheless also address this alternative argument for suppressing the statements.

It is undisputed that the statements made by Defendant on March 31, 2009, were made after the Defendant was advised of his right to remain silent and other rights, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Before a suspect's uncounseled incriminating statements made during custodial interrogation may be

admitted into evidence, the Government must show "that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991); *see also United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010). The focus of the voluntariness inquiry is on whether the defendant was coerced into making the statement. "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted).

The Supreme Court has held that a person's waiver of his *Miranda* rights is valid if the totality of the circumstances indicates that the person understood the nature of the rights and the consequences of waiving those rights and further, that the statement was freely and voluntarily made. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> Echoing the standard first articulated in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444, 475, 86 S. Ct. at 1612, 1628. The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both

the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (citations omitted); *see also Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979); *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

In this case, Defendant Cordova does not dispute that he was advised of his *Miranda* warnings before making the statements at issue on March 31, 2009. He nevertheless argues that the statements must be suppressed under *Missouri v. Siebert*, 542 U.S. 600 (2004), because the statements were obtained only after Detective McCollough had obtained coerced statements from him on both March 26, 2009, and March 30, 2009, without properly advising him of his *Miranda* rights.

The Supreme Court has held that the Self-Incrimination Clause of the Fifth Amendment does not require the suppression of a confession made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary admission from the suspect before he had been advised of the *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298 (1985).

24

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309.

In *Dickerson v. United States*, 530 U.S. 428, 444 (2000), however, the Supreme Court concluded that "*Miranda* announced a constitutional rule," and in *Missouri v. Siebert*, 542 U.S. 600 (2004), it carved out an exception to the *Elstad* rule. In *Siebert* the Court held that when a police officer purposefully withholds *Miranda* warnings while interrogating a suspect in custody in order to obtain a full confession first, and then provides him with full *Miranda* warnings and gets him to re-confess (the "question first" technique), the post-warning confession may be suppressed even if the first statement was made voluntarily. *Siebert*, 542 U.S. at 611 ("The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed.").

In *Siebert*, the police officer who conducted the interrogation of the defendant testified that he made a "conscious decision" to withhold *Miranda* warnings as an interrogation technique: question the suspect first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once." *Siebert*, 542 U.S. at 605-06. The officer acknowledged that the suspect's eventual confession was largely a repeat of information obtained prior to issuing the *Miranda* warnings. *Id.* at 606.

> As Justice Kennedy explained, suppression of a post-warning confession is required if "the two-step interrogation technique [is] used in a calculated way to undermine the *Miranda* warning." That means that if an officer employs a strategy of deliberately questioning an in-custody suspect without any *Miranda* warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the *Miranda* decision intended. The curative measures required are a "substantial break in time and circumstance between the prewarning statement and the *Miranda* warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement."

*United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (*quoting Siebert*, 542 U.S. at 621-22 (Kennedy, J., concurring)) (internal citations omitted).

In this case, Defendant argues that Detective McCollough, the officer who questioned him on March 26, March 30, and March 31 used this "question first" technique against him; he argues that his statements to Detective McCollough should be suppressed because the *Miranda* warnings were ineffective after he had already made previous incriminating statements. The undersigned, however, finds that there is no evidence in the record to support a conclusion that Detective McCollough had the intent to obtain a confession from Delgado before administering *Miranda* warnings by using the "question first" technique.

Significantly, unlike the facts in *Siebert* in which the officer conducted one continuous interrogation in the same location broken up by only a short break, in this case, the "interrogations" were conducted over a period of three separate days. It is also undisputed that, the day after he was arrested, Defendant voluntarily requested to meet with Detective McCollough on March 31, 2009. For these reasons, the undersigned rejects Defendant's argument that Detective McCollough intended to interrogate him with the "question first" technique designed to circumvent the protections of the *Miranda* warnings.

**C.      Voluntariness of Statements**

Defendant's final argument is that the statements he made on March 31, 2009, must be suppressed because they were not involuntarily given. He argues that the statements were not voluntary because Detective McCollough coerced him into giving them by making promises of immunity and threats of incarceration.

As discussed above, Defendant does not dispute that he was advised of his *Miranda* rights prior to making statements on March 31, 2009. The Supreme Court has held that a person's waiver of his *Miranda* rights is valid if the totality of the circumstances indicates that the person understood the nature of the rights and the consequences of waiving those rights and further, that the statement was freely and voluntarily made. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The Government must show "that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991); *see also United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010). "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986).

Defendant argues that the Eleventh Circuit's decision in *United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010), supports his argument that his waiver of his *Miranda* rights was not voluntary because, he contends, the various threats and promises made by Detective McCollough coerced him into making the statements. The undersigned disagrees. In *Lall*, the defendant was a twenty-year-old who lived with his parents and siblings. *Lall*, 607 F.3d at 1281. The police were investigating an armed robbery of the family home during which masked men broke into the home and demanded money, threatening the defendant's mother and siblings with violence; the defendant and his father were not at home at the time. *Id.* During the investigation of the home invasion robbery, the police officers discovered that the robbers had focused on the defendant's bedroom in particular and learned from the defendant's brother, who shared the bedroom with him, that the defendant was "was into credit card fraud and making ID's and stuff with the Internet." *Id.*

The defendant was initially questioned in his home, and was expressly told by the police officer prior to answering any questions that any information he shared with the police would not be used to prosecute him. *Id.* The police officer told him that his main concern was investigating the home invasion, because that was a "serious crime." *Id.* Although the defendant was advised of his *Miranda* rights, he spoke to the

29

police and showed them his equipment for committing identity theft: "skimmers," which were used to capture account information from swiped credit cards and driver's licenses, and an "encoder," which was used to encode the information onto new cards or licenses. *Id.* Several days later, the defendant was told to come to the police station to answer more questions, and the same police officer again told him that he "wasn't going to be charging [the defendant] with any of this." *Id.* The officer nevertheless advised the defendant of his *Miranda* rights. *Id.* Unbeknownst to the defendant, however, the police officer had already notified the Secret Service, who eventually charged the defendant with credit card fraud and identity theft. *Id.* at 1281-82.

The defendant moved to suppress his statements and the evidence he voluntarily disclosed to the police on the ground that his waiver of his *Miranda* rights was not voluntary, but the trial court denied the motion finding that, at the time the defendant initially spoke to the police in his home, he was not in custody and thus his statements were voluntary. *Id.* at 1282. The Eleventh Circuit reversed, finding that the defendant's waiver of his *Miranda* rights was not voluntary in light of the police officer's repeated promises that he would not be using the defendant's statements to prosecute him.

> It is inconceivable that Lall, an uncounseled twenty-year-old, understood at the time that a promise by Gaudio that he was not going to pursue any charges did not preclude the use of the confession in a federal prosecution. Indeed, it is utterly unreasonable to expect any uncounseled layperson, especially someone in Lall's position, to so parse Gaudio's words. On the contrary, the only plausible interpretation of Gaudio's representations, semantic technicalities aside, was that the information Lall provided would not be used against him by Gaudio or anyone else. Under these circumstances, Gaudio's statements were sufficient to render Lall's confession involuntary and to undermine completely the prophylactic effect of the *Miranda* warnings Gaudio previously administered.

*Id.*

Thus, the *Lall* court found that, although the officer administered the *Miranda* warnings to the defendant, the officer effectively negated the warnings when he contradicted them by promising the defendant that his statements would not be used to prosecute him. *Id.* at 1283-84; *see also Hart v. Attorney General of State of Florida*, 323 F.3d 884 (11th Cir. 2003) (officer contradicted *Miranda* warnings by advising the defendant that "honesty would not hurt him").

In this case, the Defendant contends that, as in the *Lall* case, Detective McCollough made statements to him during the interrogation on March 26, 2009 that were tantamount to promises of immunity from prosecution if he cooperated: "I'll keep this all on the hush-hush as long as you cooperate with me. . . I'll keep it quiet."

31

Gov. Ex. 2. The undersigned finds that the alleged "promises" from Detective McCollough in this case were not the equivalent of the express assurance of immunity that the officer gave the defendant in *Lall*. An interrogating agent can encourage cooperation and not invalidate a waiver of a suspect's *Miranda* rights. *See United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985) (statement to an accused that his "cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary"); *United States v. Graham*, 323 Fed. Appx. 793, 797 (11th Cir. 2009) (citing with approval *United States v. Jaswal*, 47 F. 3d 539, 542 (2d Cir. 1995) which held that "[T]here is no inconsistency between the required warning that a defendant's statement may be used against him and a further statement that cooperation can help him. Both are true.").

Furthermore, in this case, the alleged "promises" made by Detective McCollough were made to the Defendant during the interrogation on March 26, 2009, before the Defendant was arrested on March 30, 2009. The day after his arrest, on March 31, 2009, the Defendant voluntarily requested another meeting with Detective McCollough and was again advised of his *Miranda* rights before he made the statements at issue. Although the undersigned is recommending herein that the

Defendant's March 31 statements be suppressed as "fruit of the poisonous tree" of the illegal search of his residence on March 26, 2009, the undersigned cannot find that the Defendant's waiver of his *Miranda* rights was involuntary because he was coerced by Detective McCollough's alleged promises of immunity. At the time the Defendant made the statements on March 31, 2009, he had already been arrested and was aware that Detective McCollough would not be granting him immunity from prosecution. Accordingly, the undersigned rejects the Defendant's argument that his March 31 statements must be suppressed because his waiver of his *Miranda* rights was not voluntary.

## RECOMMENDATION

For all the above reasons, the undersigned **RECOMMENDS** that Defendant's Supplemental Motion to Suppress Evidence [123] and Second Motion to Suppress Statements [132] be **GRANTED**.

IT IS SO RECOMMENDED this 6th day of October, 2011.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE